IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID E. EDWARDS,                        No. CIV S-08-0620-CMK-P

    Plaintiff,

  vs.                                   MEMORANDUM OPINION AND ORDER

SISTO, et al.,

    Defendants.

                             /

        Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are: (1) plaintiff's motion for summary judgment (Doc. 61); and (2) defendants' cross-motion for summary judgment (Doc. 63).

/ / /

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

A. **Plaintiff's Allegations**

This action proceeds on plaintiff's first amended complaint (Doc. 13). Plaintiff states that, on January 7, 2008, inmate culinary workers started a work strike and refused to report to their work assignments. He states that inmates working in the bakery, however, did report to work but were turned away by correctional staff. According to plaintiff, an institutional lock-down was initiated before any other inmates could report for their work assignments. Plaintiff adds:

> Regardless that the institution did not need inmate Labor, later in the day on January 7, 2008, and the following three days, officers and staff went around and ordered inmates to report to work knowing full well that it was not safe for any inmate to do so. There were anonymous threats made from inmates welling out their doors, so it is not possible that officers and staff could claim that they had no knowledge of the potential great bodily harm to any inmate that left their cell when ordered. However, some inmates did leave their cell. . . . The officers ordering inmates to report to work on Monday January 7, 2008, did so with deliberate indifference to the safety of the inmates and will full knowledge that they were only pretending to take inmates to work. . . .

Plaintiff states that the details of his particular case are set forth in an inmate grievance attached to his complaint as Exhibit A. In this exhibit, plaintiff outlines the following incident:

> On February 7, 2008, I was found guilty by a Lt. Ferguson, on a fraudulent CDC-115 for not attempting to report to work and crossing an inmate "picket line," which would have put me in harms way. In other words, I was found guilty even though I could not go to work. I should have marked myself as a scab worker in front of 200 angry inmates, by coming out of my cell and pretending that I could go to work.
> Sgt. Clay falsified a 115 by stating that I was given an opportunity to go to work on 1-7-2008 and that a general call for all workers took place throughout the day. This did not happen in building one. It is also impossible for me to attend my job if no chaplains are on duty, as I am a clerk in the chapel. I never work on Monday, as there are no chaplains present. Sgt. Clay, not being my supervisor, should have investigated this before falsifying a government document. However, according to the incident report that was given to me, the chapel was taken over by Lt. Knudsen on Monday January 7, 2008, so there were no services and no chaplains. . . . Therefore, Sgt. Clay and Lt. Ferguson already knew I could not report to work on January 7, 2008, yet they continued to cause me

mental stress by lying and falsifying official government documents that have caused me harm.

Plaintiff adds that defendant Ferguson denied him an investigating employee, denied him witnesses, and denied him the right to postpone the hearing. He also states that "Lt. Ferguson violated the law, by using foul language during my hearing, and finding me guilty of not coming out of my cell, putting myself in harm's way, when he knew in fact I could not even go to work."

Plaintiff asserts that defendants Sisto, Singh, and Peck were aware of the danger posed to inmates who crossed the inmate strike line to report to work assignments. As to defendant Peck in particular, plaintiff states:

> Cpt. Peck is believed to be the officer who spearheaded all these violations by issuing orders to correctional officers and staff to coerce inmates to cross the strike line. . . .

Plaintiff alleges a violation of his rights under the Eighth Amendment. He also alleges that defendants denied him due process.

**B.     The Parties' Evidence**

1.     Plaintiff's Evidence

Attached to plaintiff's motion for summary judgment as Exhibit A is a January 7, 2008, report by R. Knudsen regarding the inmate work stoppage.

Attached to plaintiff's motion as Exhibit B is his own "Statement of Claim." Also at Exhibit B is plaintiff's inmate appeal dated February 14, 2008.

Attached to plaintiff's motion as Exhibit C is a copy of the court's May 6, 2011, screening order.

Attached to plaintiff's motion as Exhibit D is an undated declaration by inmate Steve Prellwitz, who states:

> On January 7, 2008, some inmates instituted a work strike and the Administration at CSP Solano responded by cell feeding us and announcing we were on lock down. Later that day I was asked to cross an inmate picket line and go to work. I knew it was not safe, but because of my strong religious beliefs I went anyway. Those beliefs are that I must

1 obey the authorities. Inmates were yelling threats at me as I left, being a large building with 200 inmates I could not tell who was threatening me individually. As it turns out I left the building for nothing. I did not go to work that day. It was only for show. They marched the few inmates who crossed the strike line out to the handball court and then took us back into the building, once more submitting me to death threats from anonymous shouts.

Attached to plaintiff's motion as Exhibit E is what appears to be a generic rules violation report with a description of the work stoppage incident and blank spaces to insert the names of inmates who refused to go to work.

Attached to plaintiff's motion as Exhibit F is a January 12, 2008, memo from Ross Novinger, the supervisor of the prison metal fabrication shop regarding the work stoppage. Mr. Novinger states:

> . . . We were then ordered to interview each of the PIA inmate workers. We were told to order each of them to go to work or they would receive a 115. We then all assembled outside on yard one. We were instructed to start in building six. As we entered building six it was normal, but as some of our inmate workers came out the yelling of threats to the workers started and persisted. The noise continued making it hard to even hear those inmates being interviewed while being verbally threatened "get out of our building or you're dead" "you motherfuckers better leave" and on and on while trying to interview.  Over and over the MAC [Men's Advisory Council] reps were ahead of us in the buildings, this didn't help us at all. . . . This whole thing of being told to go interview the inmates within the buildings, felt as if there's a forced presumption to write something that doesn't look at all like we observed within the buildings. By the time we entered the last two buildings the threats were being yelled even more than before at us, the staff, and no one from custody moved to assist us, the free staff.  There was an awareness and understanding among all the free staff that we had inadvertently endangered the lives of those inmates that had come out and ourselves. I cannot really say that I ordered any of them to go to work in those conditions but what in reality I told them to protect them as best that they could and do what they needed to do to keep safe.

///

///

///

///

///

Attached as Exhibit G to plaintiff's motion is an affidavit signed on January 30, 2008, by John Steffan, a member of the prison's Mens Advisory Council. Mr. Steffan corroborates Mr. Rogers' statements. Mr. Steffan states:

> As a representative of Mens Advisory Counsel [sic] at CSP Solano Yard 1, I was called to a meeting with Captain Peck and 28 other inmates. This meeting was to discuss the issues of why the inmates were conducting a peaceful work strike. I directly addressed Captain Peck and asked him if the inmates [who] crossed the "picket" line and go to work, can be guarantee their safety? His immediate response was no. . . .

Attached to plaintiff's motion as Exhibit H is an "informational chrono" written on January 24, 2008, by T. Melton who, at the time, was the vocational instructor for the prison's HVAC work program. The chrono concerns a disciplinary citation issued against inmate Braden, a student of Melton's. Mr. Melton states:

> In a mass distribution, I/M Braden received a CDC-115 dated 1/08/08 because several inmates on Facilities 1 and 2 participated in a work stoppage. I am Mr. Braden's supervisor and I personally went to his cell during the lockdown and asked him if he wanted to go to work. However, due to the obvious safety concerns at the time, I did not order him to do so. Nonetheless, he told me that he did in fact want to go to work, and at no time did he ever refuse. But regardless, on the day in question, I had no inmate workers in my shop and Mr. Braden wasn't afforded the opportunity to attend his job assignment. And afterwards, upon review of the CDC-115, I noticed that the handwriting on the document wasn't even mine. I am submitting this chrono due to the fact that not only is the information in the aforementioned CDC-115 inaccurate and does not represent Mr. Braden's actions, but it is also one that I did not author.

Attached to plaintiff's motion as Exhibit I is a March 22, 2011, declaration from Michael J. Rogers who, at the time of the events in question in this case, was employed by the California Department of Corrections and Rehabilitation as an instructor in the Vocational Printing and Graphic Arts program at plaintiff's prison. Mr. Rogers describes a situation similar to the one described by Mr. Melton. Mr. Rogers states:

> On the morning of January 7, 2008, I was informed by my supervisor that inmates would not be reporting to my Vocational Printing and Graphic Arts program and that the inmates were locked down due to an inmate work stoppage which began with the early morning kitchen crew. My supervisor, M. Lyons, told the vocational instructors that all education

5

staff were to report to the chapel on level III to be briefed and instructed as to what we were to do with regard to the work stoppage.

In this meeting Captain Peck informed us that we were to go to the cell of each inmate enrolled in our programs and inform the inmates that we were ordering them to report to work. If they did not comply, we were to write a CDCR 115 disciplinary report. Captain Peck told us that the officers would "stage" the compliant inmates together in the dayroom so that they could record which inmates were compliant with the order to report to work.

Many of us were concerned that the inmates assigned to us would be placing themselves in danger from other inmates if they agreed to report to work. When this was expressed at the meeting to Captain Peck he told us that the effects of prison politics was not our concern.

I went to each building with the other staff and told each inmate on my roster to report to work or get a CDCR 115 written. Most of my students expressed that they would love to report to work but that they feared for their safety. Indeed, when the officers "staged" the compliant inmates in the dayroom, other inmates yelled terrible threats down to the staged inmates. I understood that my students' fears were real. I could not write the disciplinary on most of them for this reason. I felt that the disciplinary reports I wrote were under duress from Captain Peck and my supervisors.

One week later several of the inmates on my roster showed me copies of CDCR 115 disciplinary reports which I did not write, yet they had my name signed on them. The signature was not mine. Other students showed me copies of CDCR 115's that were written to my students and signed by Sergeant Clay.

    2.    <u>Defendants' Evidence</u>

Defendants submitted a separate statement of undisputed fact in support of their cross-motion for summary judgment. Defendants' evidence consists entirely of the declaration of defendant Peck. Defendant Peck states:

    a.    Plaintiff, along with other inmates, refused to report to work.

    b.    Plaintiff was issued a rules violation report for his refusal.

    c.    Plaintiff was not injured.

///

///

///

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.
>
> Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

7

1  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
2  of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);
3  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and
4  that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict
5  for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).
6        In the endeavor to establish the existence of a factual dispute, the opposing party
7  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
8  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
9  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
10 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
11 genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
12 committee's note on 1963 amendments).
13       In resolving the summary judgment motion, the court examines the pleadings,
14 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
15 any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See
16 Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed
17 before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.
18 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
19 produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen
20 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
21 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply
22 show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken
23 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
24 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).
25 / / /
26 / / /

### III.  DISCUSSION

In their cross-motion for summary judgment, defendants argue that plaintiff cannot prevail on his Eighth Amendment claim for the following reasons: (1) defendants took reasonable steps to protect plaintiff from harm; (2) plaintiff was not injured; and (3) defendants are entitled to qualified immunity.  As to plaintiff's due process claim, defendants argue that plaintiff's claim is vague and, in any event, a state of emergency order suspended due process time constraints during the time period in question.

**A.  Eighth Amendment Safety Claim**

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Under these principles, prison officials have a duty to take reasonable steps to protect inmates from physical abuse.  See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir. 1982); Farmer, 511 U.S. at 833.  Liability exists only when two requirements are met: (1) objectively, the prisoner was incarcerated under conditions presenting a substantial risk of

serious harm; and (2) subjectively, prison officials knew of and disregarded the risk. See Farmer, 511 U.S. at 837. The very obviousness of the risk may suffice to establish the knowledge element. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995). Prison officials are not liable, however, if evidence is presented that they lacked knowledge of a safety risk. See Farmer, 511 U.S. at 844. The knowledge element does not require that the plaintiff prove that prison officials know for a certainty that the inmate's safety is in danger, but it requires proof of more than a mere suspicion of danger. See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986). Finally, the plaintiff must show that prison officials disregarded a risk. Thus, where prison officials actually knew of a substantial risk, they are not liable if they took reasonable steps to respond to the risk, even if harm ultimately was not averted. See Farmer, 511 U.S. at 844.

At the outset, the court rejects defendants' argument that they cannot be liable because plaintiff suffered no actual physical injury as a result of the alleged safety threat. First, defendants cite no authority in support of this position, and the court is aware of none. Second, as the legal discussion above indicates, § 1983 liability may exist where prison officials disregard a known safety risk. Thus, it is the disregard of the possibility of an injury that is actionable and prison officials may be liable for such disregard even where injury does not in fact occur.

Defendants also argue that they are shielded from liability because they took reasonable steps to mitigate any safety risks. In support of this argument, defendants state that "it is . . . undisputed that Prison Officials took proper reasonable steps to ensure the safety of the inmate population who were not striking. . ." given that cell feeding was conducted and inmates received medications in their housing units. The court does not agree that the issue is undisputed. Plaintiff attaches to his motion for summary judgment evidence tending to show that, contrary to defendants' position, they actually knew of a risk to inmate safety posed by requiring them to cross the strike line and that they would not or could not guarantee inmates' safety. In fact, plaintiff's evidence suggests that defendants staged the entire situation in such a way as to generate a basis to write rules violations reports against inmates who reasonably

refused to put their safety in danger by crossing an inmate strike line.

While the court concludes that defendants' evidence is insufficient to establish as a matter of law that they cannot be liable under the Eighth Amendment, the court does not also conclude that plaintiff's evidence is sufficient to prevail at the summary judgment stage. Plaintiff's evidence is somewhat general in that it refers to the work stoppage and how staff responded. His evidence, at best, allows for reasonable inferences as to the actions and motivations of defendants in this case. The weight to be given to the evidence and inferences to be drawn are matters which must be decided by a jury.

**B.     Due Process Claim**

Plaintiff claims that a rules violation report was issued based on false information. More specifically, in the context of his disciplinary hearing plaintiff claims that defendant Ferguson denied him an investigating employee, denied him witnesses, and denied him the right to postpone the hearing. With respect to prison disciplinary proceedings, due process requires prison officials to provide the inmate with: (1) a written statement at least 24 hours before the disciplinary hearing that includes the charges, a description of the evidence against the inmate, and an explanation for the disciplinary action taken; (2) an opportunity to present documentary evidence and call witnesses, unless calling witnesses would interfere with institutional security; and (3) legal assistance where the charges are complex or the inmate is illiterate. See Wolff v. McDonnell, 418 U.S. 539, 563-70 (1974). Due process is satisfied where these minimum requirements have been met, see Walker v. Sumner, 14 F.3d 1415, 1420 (9th Cir. 1994), and where there is "some evidence" in the record as a whole which supports the decision of the hearing officer, see Superintendent v. Hill, 472 U.S. 445, 455 (1985).

In this case, defendants have not presented any evidence to establish, as a matter of law, that plaintiff cannot prevail on his due process claim. In particular, there is nothing from defendant Ferguson regarding the disciplinary hearing. As to defendants' argument that plaintiff's due process claim is not cognizable to the extent his disciplinary hearing resulted in a

11

loss of good-time credits, defendants do not present any evidence indicating that good-time credits were lost in this case. Nor has plaintiff presented evidence to establish, as a matter of law, that his due process rights were in fact violated. This issue remains a triable question of fact for a jury that cannot be resolved at this time in favor of any party on summary judgment.

## IV. CONCLUSION

In this case, the court concludes that the parties' evidence is insufficient to grant summary judgment in favor of any party on any issue. By separate order, the court will issue a final schedule for this case.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 61) is denied;
2. Defendants' cross-motion for summary judgment (Doc. 63) is denied; and
3. Plaintiff's motion to strike defendants' reply brief (Doc. 66) is denied.

DATED: September 12, 2011

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE